(Not for Publication)                                      (Docket Entry No. 31)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
                                                    :
RAYMOND CHAMBERS                    :
                                                    :
                        Plaintiff,          :          Civil No. 04-CV-583 (RBK)
                                                    :
            v.                               :          **OPINION**
                                                    :
HEIDELBERG USA, Inc.                 :
                                                    :
                        Defendant.         :
_____  :


**KUGLER**, United States District Judge:

This matter comes before the Court on a motion for summary judgment by Defendant

Heidelberg USA, Inc. on all claims in Plaintiff Raymond Chambers' Complaint.  The Complaint

alleges that, during the course of Plaintiff's employment, the Defendant subjected him to racial

discrimination and ultimately terminated his employment in violation of both Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq., and New Jersey's Law

Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1 et seq.  In its motion for summary

judgment, Defendant asserts that Plaintiff has not provided any evidence of racial discrimination

to support his claims.  For the reasons set forth below, this Court will grant Defendant's motion .

## I. BACKGROUND

Defendant Heidelberg USA, Inc.("Heidelberg") sells and services large commercial

printing and graphic arts equipment. (Def. Facts ¶ 1.)[1]  Plaintiff Raymond Chambers is a black male who was employed by Heidelberg as a Field Service Dryer Technician from March 28, 1999 until March 31, 2003. (Compl. ¶ 2.)  As Heidelberg's employee, Chambers performed startup and service work on the dryer component of Heidelberg's equipment at customer job sites. (Pl. Dep. 62-66, 86-88.)  He would travel from his home in New Jersey to customer sites and then report back to a service department located in Nashville, Tennessee. (Pl. Dep. 64-66.)

Over the course of his employment, Chambers worked under three direct supervisors in a group of approximately ten to twelve Field Service Technicians.  (Pl. Dep. 82-88.)  Gary Mitchler ("Mitchler") was his direct supervisor from March 1999 until approximately October 2000; Eric Sucha ("Sucha") was his supervisor from October 2000 until approximately August 2002; and Geoffrey Adamson ("Adamson") was his supervisor from approximately August 2002 until March 2003.  (Pl. Dep. 66-67, 82-85.)

Chambers asserts that he had many problems with Sucha during the time that Sucha supervised him, and he further claims that there have been similar disagreements between Sucha and a white service technician named Chuck Sowers.  (Compl. ¶ 17; Pl. Dep. 189-193).  Specifically, Chambers alleges that Sucha harassed and discriminated against him by (1) denying him a cell phone, (2) excessively paging him, (3) failing to send him to a training class, and (4) controlling some of his travel arrangements, which Chambers asserts were purposely inconvenient. (Compl. ¶¶ 18-20).

First, with regard to the training issues, Chambers' alleges that shortly after Sucha

---

[1]Because the Plaintiff failed to provide a proper statement of material facts pursuant to Local Rule 56.1, the majority of facts come from Defendant's statement of facts and the corresponding exhibits.

became his supervisor, Chambers was the only individual in his group who was not sent to a training class dealing with the burner component of Heidelberg's dryers. (Compl. ¶ 18.)  By contrast, Sucha claims that there were two other Service Technicians, both white males, who also never attended the training session. (Sucha Declaration, ¶ 4.)

Second, Chambers claims that Sucha made major changes to his already established travel arrangements, which made traveling very inconvenient for Chambers. (Compl. ¶ 20;  Pl. Opp. at 12).  Sucha, however, states that in an effort to control costs, Heidelberg requested that managers take a more active role in making travel arrangements for employees in their various groups.  (Sucha Declaration, ¶ 6).  Moreover, Section 2B of the Heidelberg policy handbook grants managers the authority to make travel arrangements by stating that, "The technician will make travel arrangements for each job assignment, unless the supervisor decides to complete these himself/herself."  (See Pl. Dep. 215).

Third, Chambers alleges that Sucha paged him excessively and that other employees received cell phones to replace their pagers before Chambers did.  In particular, Chambers states that he was paged four to five times daily and, on information and belief, he claims that most team members were only paged once. (Compl. ¶ 24).  In response, Sucha explains that he rolled out cell phones to replace pagers until every Service Technician received a cell phone.  (Sucha Declaration, ¶ 5).  Sucha also argues that he paged all of the Service Technicians who reported to him, and further, that he only paged Chambers when necessary to accomplish business purposes. (Sucha Declaration, ¶ 5.)

Based upon these issues, Chambers lodged complaints about Sucha to Heidelberg's human resources department, but he never claimed that he was being discriminated against based

on his race.  (See Pl. Dep. 187-193).  Chambers also admits that he never witnessed any

Heidelberg manager or supervisor make any negative or derogatory comments about his race or

any other employee's race.  (Pl. Dep. 219-220).  Furthermore, on May 24, 2002, Chambers

allegedly left a voice mail for human resources manager, Alicia Stignani, stating that he was not

complaining that there was any form of discrimination. (See Exhibit 27 to Pl. Dep.)  Plaintiff

subsequently deposed that he did not use the phrase "racial discrimination" because he feared

retaliation, even though he had never witnessed any other person suffer retaliation.  (Pl. Dep.

185-187).  Chambers also admitted that his interactions with Sucha were minimal after August

2002 and that his alleged mistreatment ended after Sucha no longer served as his supervisor.  (Pl.

Dep. 85, 163).

On March 31, 2003, Chambers' acting supervisor, Geoffrey Adamson, terminated

Chambers. (See Adamson Declaration, ¶ 7; Pl Dep. 220-226).  Adamson stated that, in March

2003, he received a number of complaints regarding Chambers' performance and attitude at

customer job sites. (Adamson Declaration, ¶ 7.)  In particular, Adamson received a report from

Bram Thijseen, a Technical Support Coordinator with Quebecor, one of Heidelberg's customers.

The report stated that Chambers left a Quebecor job site before the equipment was operating

properly and it further explained that Quebecor was not satisfied with Chambers' work

performance on the job. (Adamson Declaration, ¶ 6.)  Adamson also received a report from

Sucha which indicated that Chambers told a customer representative that a software upgrade

recommended by Heidelberg was a "waste of time" and would be unhelpful to the customer.

(Adamson Declaration, ¶ 6.)  Finally, Adamson received an e-mail report on March 26, 2003

from Heidelberg's manager of press installations, Gene Cain.  The email stated that Chambers

4

informed a representative of one of Heidelberg's customers that a piece of Heidelberg equipment was not properly engineered, even though Chambers did not have the authority or expertise to make that kind of assessment.  (Adamson Declaration, ¶ 6; Exhibit 1 to Adamson Declaration.) Gene Cain also reported similar problems with Chambers' performance at Publication Printing, another Heidelberg customer.  Cain noted that Publication Printing advised Cain that it did not want Chambers back at its plant under any condition.  (Adamson Declaration ¶ 6; Exhibit 1 to Adamson Declaration.)

Chambers asserts that Sucha and his white co-workers were the persons responsible for leveling numerous charges against him. (Pl. Opp. ¶ 13).  He claims that he was not allowed to review and defend himself against these charges and that Heidelberg was "building a paper trail against him by ambush."  (Pl. Opp. ¶ 13.)  In defense of his actions at the Quebecor job site, Chambers alleges that when he encountered a problem with the gas train assembly installation on the job site, he took it upon himself to rewire the gas train assembly, which he claims demonstrated economical efficiency and problem solving skills.  (Pl. Compl. ¶¶ 21, 22).

Additionally, Chambers alleges that Adamson consulted with Sucha and/or Spencer Mieras ("Mieras"), the head of the Service Department, in making the decision to terminate Chambers. (Pl. Opp. ¶¶ 2-3).  Adamson, however, contends that Mieras and Sucha were not involved in the decision-making process. (Adamson Declaration, ¶ 7).  Adamson claims that he only discussed his decision with his supervisor, Bill Stack, and Heidelberg's human resources department. (Adamson Declaration, ¶ 7.)  Adamson also asserts that race did not play any part in his decision to terminate Chambers. (Adamson Declaration, ¶ 7.)

After his termination, Chambers filed a Charge of Discrimination with the Equal

Employment Opportunity Commission ("EEOC") on May 23, 2003.  (Exhibit 19 to Pl. Dep.)

The EEOC dismissed the charge stating that, based upon its investigation, it was unable to

conclude that the information obtained established any violation of the relevant civil rights

statutes. (Exhibit 29 to Pl. Dep.)  The dismissal notice also granted Chambers the right to file a

lawsuit, under federal law, in federal or state court.

Thereafter, on February 11, 2004, Chambers filed his Complaint in this Court.

Heidelberg then filed the present motion for summary judgment on November 3, 2005.

Chambers' filed an opposition brief on December 5, 2005 and Heidelberg replied on December

12, 2005.[2]  The Court will address the parties' arguments in turn.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the Court is satisfied that "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A genuine issue

of material fact exists only if "the evidence is such that a reasonable jury could find for the

nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The burden of establishing the nonexistence of a "genuine issue" is on the party moving

for summary judgment. Celotex, 477 U.S. at 330. The moving party may satisfy this burden by

either (1) submitting affirmative evidence that negates an essential element of the nonmoving

---

[2] Defendant requests that this Court dismiss Plaintiff's opposition because it was filed out of time under Local Rule 7.1(d).  After filing the late opposition, Plaintiff's attorney submitted a letter to this Court explaining that the opposition was filed late because her father was hospitalized in Jackson, Mississippi and she needed to make several trips to Jackson to see him. Chambers could have received an automatic 14 day extension to file the opposition if Chambers' attorney would have submitted a timely letter to the Court as well as to Defendant.  See L. Civ. R. 7.1(d)(5).  Despite her failure to do so, this Court will, in the interest of completeness, consider Plaintiff's untimely opposition.

party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. Id. at 331. Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## III. DISCUSSION

In general, courts apply a similar analysis to discrimination claims brought pursuant to Title VII and the NJLAD. Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 277 n.7 (3d Cir. 2001) (observing that "any plaintiff who has fulfilled a Title VII prima facie case will have also shown the elements required by the NJLAD."); Cortes v. Univ. Of Med. & Dentistry of New Jersey, 391 F. Supp. 2d 298, 311 (D.N.J. 2005). Title VII and the NJLAD both prohibit employment discrimination because of race, color, religion, sex, or national origin.[3] Under both of these statutes, Chambers alleges that Heidelberg created a hostile work environment and ultimately discharged him for discriminatory and retaliatory purposes.

### A. Hostile Work Environment Claim

The Complaint alleges that Defendant's actions "unreasonably interfered with plaintiff's work performance and lead to an intimidating, hostile, and offensive work environment permeated with discriminatory intimidation so severe and pervasive as to alter the terms and conditions of plaintiff's employment." (Compl. ¶ 30.) To state a hostile work environment claim under Title VII, the plaintiff must show that (1) he suffered intentional discrimination because of

---

[3] The NJLAD also prohibits employment discrimination on additional grounds including age, ancestry, marital status, and sexual orientation, among others. See N.J. Stat. Ann. § 10-5:12.

his race; (2) the harassment was severe or pervasive; [4] (3) the harassment detrimentally affected

him; (4) the harassment would detrimentally affect a reasonable person of the same race in that

position; and (5) the existence of respondeat superior liability.  Jensen v. Potter, 435 F.3d 444,

449 (3d Cir. 2006).  Similarly, when a plaintiff alleges racial harassment under the NJLAD, he

must demonstrate that the defendant's conduct (1) would not have occurred but for the

employee's race, and the conduct was (2) severe or pervasive enough to make a (3) reasonable

African-American believe that (4) the conditions of employment are altered and the working

environment is hostile or abusive. Caver v. City of Trenton, 420 F.3d 243, 262-63 (3d Cir. 2005)

(citing Taylor v. Metzger, 706 A.2d 685, 688-89 (N..J. 1998)). In analyzing a hostile work

environment claim, the Court may consider "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift

Systems, Inc., 510 U.S. 17, 23 (1993).

     1. Discrimination Because of Race

Chambers alleges that Heidelberg harassed him because he is black.  To establish the first

prong of a hostile work environment based upon racial discrimination, a plaintiff must show that

race is a substantial factor in the discrimination and that, if the plaintiff had been of another race,

---

[4] The Third Circuit has previously stated that the discrimination must be "pervasive and regular."  See e.g., Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001); West v. Philadelphia Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995); Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990).  However, in Jensen, the Third Circuit recognized that the United States Supreme Court's test requires only that the harassment be "severe or pervasive" not "pervasive and regular."  Jensen, 435 F.3d at 449 n.3 (citing Pa. State Police v. Suders, 542 U.S. 129, 133 (2004); Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002); Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). Because the distinction is significant and the Supreme Court's determination controls, this Court will use the "severe or pervasive" test. See id.

he would not have been treated in the same manner. See Aman v. Cort Furniture Rental Corp., 85

F.3d 1074, 1083 (3d Cir. 1996). Speculations, generalities, and gut feelings, however genuine,

do not allow for an inference of discrimination to be drawn when they are not supported by

specific facts. Little v. State of New York, No. 96 CV 5132, 1998 WL 306545, at *6 (E.D.N.Y.

June 8, 1998); see Hargrave v. County of Atlantic, 262 F. Supp. 2d 393, 419 (D.N.J. 2003)

(noting that despite plaintiff's conclusory allegation of racial harassment, there was nothing

about the alleged misconduct that would support an inference of racial animus or hostility toward

the plaintiff).

   As a preliminary matter, the Court notes that Chambers never witnessed any Heidelberg

manager or supervisor make any negative or derogatory comments regarding his race or any other

employee's race during the period of his employment. (See Pl. Dep. 219-220.)  In other words,

although Chambers does not allege any overt acts of racial animus, the Court must still evaluate

whether the Defendant created a hostile work environment (because of Plaintiff's race) through

facially neutral mistreatment of the Plaintiff.  See Cardenas v. Massey, 269 F.3d 251, 262 (3d

Cir. 2001) (recognizing that "the advent of more sophisticated and subtle forms of discrimination

requires that we analyze the aggregate effect of all evidence and inferences therefrom, including

those concerning incidents of facially neutral mistreatment, in evaluating a hostile work

environment claim"); Hargrave, 262 F. Supp. 2d at 412 (noting that "in order to constitute racial

harassment, the subject comments or behavior need not be overtly racial in nature").

   Nevertheless, even considering the alleged instances of facially neutral mistreatment,

Chambers has not demonstrated that race was a factor in the way that he was treated.  The

Plaintiff has utterly failed to present any competent evidence to show that the allegations

regarding his training, travel schedule, and communication issues are in any way connected to his race.

First, with respect to the allegation that Chambers was the only member of his group not sent to the Eclipse training session, Chambers sets forth no evidence whatsoever to demonstrate the truth of that assertion.  During his deposition, Chambers admitted that he had no personal knowledge of whether any other technicians in his group did not go to the training. (See Pl. Dep. 174-179.)  Rather than investigating the issue, Chambers chose not to conduct any discovery on this issue or any other issue raised in the Complaint. (See Def. Mem. at 13-14.)  By contrast, Heidelberg presented evidence which shows that white technicians were likewise not sent to that same training session. (See Sucha Declaration, ¶ 4.)  Bill Ellis and James Carroll, both white males in Chambers' group, never attended an Eclipse training session. (Id.)  In his declaration,[5] Sucha explains that Ray Gitzendanner, an employee who reported to Sucha, made arrangements for Service Technician Training at Eclipse Combustion in Rockford, Illinois. (Id.)  Gitzendanner, and two other Service Technicians attended the initial training session at Rockford.  Those two technicians who attended along with Gitzendanner had more seniority than Chambers and lived within driving distances of the training location. (Id.)  Because there was negative feedback regarding the effectiveness of the initial training session, no further Eclipse training was ever conducted. (Id.)  On these facts, there is nothing to suggest that the decision not to send Chambers to the Eclipse training was motivated by racial animus or hostility.

Second, Chambers claims that his white co-workers did not experience the inconvenient

---

[5] The Defendant presented sworn declarations of several individuals named in the Complaint.  Because the Plaintiff never sought to depose anyone (or otherwise obtain discovery from these individuals), the Defendant could not elicit the same information via cross-examination during a deposition.

travel arrangements that he experienced under Sucha's supervision; however, Chambers presents

nothing more than an allegation "on information and belief" to support that claim. (See Pl. Opp.

at 12.)  Such unsubstantiated speculation is insufficient to withstand summary judgment.

Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (citing Celotex, 477 U.S. at

325).  Conversely, Heidelberg presented Sucha's sworn declaration, which explains that, in an

effort to curb costs, the company requested that he and other managers take a more active role in

making travel arrangements for the employees in their groups, and that Sucha, therefore, became

more involved in making travel arrangements for Chambers and other white technicians under

his supervision. (Sucha Declaration, ¶ 6.)  Because there is absolutely no record evidence to

refute Sucha's explanation, Chambers has failed to raise a genuine issue of fact regarding the

motivation behind Sucha's involvement in Chambers' travel schedule.

  Third, with regard to Chambers' assertion that Sucha excessively paged him and did not

promptly provide him with a cell phone, the evidence Chambers presents on these issues does not

support a finding of discrimination based on race.  Chambers' opposition states that in the spring

of 2001, Sucha's supervisor allegedly directed Sucha to "cease the excessive paging." (Pl. Opp.

at 13.)  Chambers goes on to allege that although Sucha did temporarily stop the purportedly

excessive paging, Sucha allegedly resumed the practice after he received a new supervisor. (Pl.

Opp. at 13.)  In support of these contentions, Chambers cites to his own affirmation, which

merely states that Sucha excessively paged Chambers and that "based on information and belief,

Mr. Sucha never paged any of [his] coworkers excessively." (Pl. Declaration, attached as Exhibit

6 to Pl. Opp.)  Again, the Court notes that at this stage in the proceedings, it is insufficient to rely

merely  upon "information and belief" to prove a claim or preclude summary judgment.  In

addition, Chambers cites to an email that he drafted in the spring of 2001 to support the claim

that Sucha excessively paged him even after Sucha's supervisor allegedly directed Sucha to stop

the excessive paging in the spring of 2001.  (See Pl. Opp. at 13; Email attached to Pl. Opp. at

Exhibit 6.)  However, that email lists a series of events related to Chambers' job assignments in

March 2001, but it does not in any clear way indicate that Sucha had been excessively paging the

Plaintiff.  Not only that, but an email written *in* the spring of 2001 is not evidence that Sucha

excessively paged Chambers *after* the spring of 2001.  Moreover, Heidelberg presented evidence

that Sucha only paged Chambers when necessary to achieve a business purpose, and further, that

Sucha often paged all of the employees under his supervision as part of his job. (Sucha

Declaration, ¶ 5.)  Therefore, based on the relevant evidence before the Court, the Plaintiff has

failed to present a genuine issue of material fact regarding whether he was excessively paged, and

if so, whether the reason for that excess was Plaintiff's race.

In addition, the Court notes that Chambers never alleged racial discrimination when he

lodged complaints about Sucha to Heidelberg's human resources department.  In fact, Chambers

apparently left a voice mail for human resources manager, Alicia Stignani, specifically stating

that he was not complaining of any form of discrimination. (See Exhibit 21 to Pl. Dep.)

Moreover, in his complaints to human resources, Chambers provided information identifying

white employees who allegedly had similar problems with Sucha.  For instance, in a January 10,

2002 email to human resources, Chambers states "There have been disagreement [sic] with Mr.

Sucha and other service Techs." (See Exhibit 21 to Pl. Dep.)  Later, Chambers deposed that the

"other service Techs" mentioned in the email referred to a white employee named Chuck Sowers,

who allegedly was also "very unhappy" with Sucha.  (Pl. Dep. 189-93.)  Similarly, in an April

21, 2002 email to human resources, Chambers forwarded a work report regarding a white Service Technician and stated that it was "an example of what is going on with this group." (See Exhibit 23 to Pl. Dep.)  In other words, Chambers' own complaints tend to show that he would not have been treated differently if he had been white.

Overall, aside from his mere speculation and conclusory allegations, Chambers has not provided any competent evidence that might lead a reasonable fact finder to believe that race was a factor in the treatment he received from the Defendant.  Even considering the allegations regarding Plaintiff's travel, training, and communications issues as a whole, the record is devoid of any evidence to show that the treatment Chambers received was due to his race.  As a result, the Court will grant Defendant's motion for summary judgment on Plaintiff's hostile work environment claims under the NJLAD and Title VII.  However, as an alternative basis for this holding, the Court will also analyze whether the alleged harassment was severe or pervasive enough to constitute an actionable hostile work environment claim.

### 2. Severe or Pervasive Harassment

To be actionable under Title VII and the NJLAD, any alleged harassment must be so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive environment. Weston v. Pennsylvania, 251 F. 3d 420, 426 (3d Cir. 2001). The requirement contains both a subjective and objective component. Jensen, 435 F.3d at 451 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998)).  That is, the alleged harassment must be so severe or pervasive that it not only detrimentally affects the plaintiff, but would also detrimentally affect a reasonable person of plaintiff's race in the same position. Id. As mentioned above, the factors to be considered include "the frequency of the discriminatory conduct; its

13

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993)).  No single factor is dispositive as the inquiry must focus on the totality of the circumstances.  Id. at 451-52.

In this case, Chambers' complaints do not amount to severe or pervasive harassment. The alleged harassment consists of the following: (1) Sucha's failure to send Chambers to a training session held in Illinois, (2) Sucha's alleged "excessive" paging of Chambers, and (3) Sucha's intervention in Chambers' work-related travel arrangements.  With respect to the training issue, the record shows that two local employees who lived in Illinois were sent to that training session and reported back to Heidelberg that the training was not particularly useful. (See Sucha Declaration, ¶ 4.)  Other Service Technicians in Chambers' group, including white employees, were similarly not sent to this one-time training session. (Id.)  There is no evidence that Chambers was not sent to any other training sessions, nor is there any evidence that this one failure to attend the Eclipse training had any effect whatsoever on Chambers' employment. Likewise, although Chambers alleges that Sucha excessively paged him and intervened in his travel arrangements on a regular basis, there is no evidence to support the alleged severity or regularity of that conduct.  Rather, the evidence demonstrates that Sucha occasionally intervened in the travel arrangements of all of his subordinates pursuant to a company directive requesting that he do so to control expenses. (See Sucha Declaration, ¶ 6.)  Moreover, Sucha declared that he paged all of the employees in his group as that was the main form of communication he had with his traveling employees. (Sucha Declaration, ¶ 5.)  Because Chambers and his co-workers constantly traveled and did not all physically report to a central location on a regular basis,

communication by way of pager or telephone appears to be an integral part of Chambers'

employment.  In other words, not only does Chambers fail to present any evidence that Sucha's

paging and involvement in his travel arrangements was severe or pervasive, but even if it did

occur on a regular basis, there is no evidence to suggest that, in the context of Plaintiff's

employment, he suffered any detrimental effect, or that a reasonable black employee in his

position would have been detrimentally affected.

In his opposition papers, Chambers also alleges that Defendant harassed him by not

providing him with copies of a letter and an email, written by other Heidelberg employees, which

complained of Chambers' job performance. (See Pl. Opp. at 12.)  Paul Northrup wrote the letter

in question on July 10, 2001, and in it he explained that Chambers had been purposely unhelpful

and withheld information at a customer job site. (See Exhibit 13 to Pl. Dep.)  Gene Cain wrote

the email at issue on March 26, 2003, and in it he (1) complained that Chambers told a customer

that a piece of Heidelberg equipment was incorrectly designed, and (2) explained that a different

customer told Cain that it did not want Chambers back at its job site under any conditions. (See

Exhibit 2 to Adamson Declaration.)  Chambers alleges that he should have been provided a copy

of these documents so that he could "review, address, or defend" himself with respect to the

complaints in those documents. (Pl. Opp. at 12.)  However, Chambers was given an opportunity

to defend himself with respect to the incident discussed in the July 10, 2001 letter during a

disciplinary meeting held on September 5, 2001. (See Def. Facts ¶¶ 14-19.)  Moreover, in June

2002, Chambers received a copy of a final warning regarding his disciplinary issues, after a

meeting with Sucha and Mieras on June 12, 2002. (Def. Facts ¶ 20; Exhibit 17 to Pl. Dep.;

Exhibit 2 to Adamson Declaration.)  The written warning clearly states that ". . . this is your **final**

15

**warning**.  If management receives additional complaints about your performance during an installation or from others in the organization about your ability and willingness to work and get along with other personnel, your employment with Heidelberg will be terminated." (Exhibit 17 to Pl. Dep.; Exhibit 2 to Adamson Declaration.)(emphasis in original).  Thereafter, Chambers' supervisor received the March 26, 2003 email from Gene Cain, as well as other complaints regarding Chambers' performance. (Adamson Declaration, ¶¶ 6-7.)  As a result, Chambers was terminated. (Id.)  Based on these undisputed facts, there is no evidence to suggest that (1) Chambers was not on notice after June 2002 that any further complaints about him would result in termination without further consultation, or (2) that Defendant suffered "pervasive harassment" merely because he did not receive a copy of the July 11, 2001 letter or the March 26, 2003 email. (See Pl. Opp. at 12.)

Overall, in examining the totality of the circumstances, a reasonable fact finder could not conclude that Chambers was subject to any racially-motivated harassment that was severe or pervasive enough to alter the conditions of his employment or create an abusive environment. Because Chambers' opposition does little more than re-allege the factually unsupported allegations contained in his pleadings, Chambers has not established the existence of a genuine issue of material fact that would defeat Defendant's motion for summary judgment on his hostile working environment claims under Title VII and the NJLAD.  Accordingly, as an alternative to the grounds analyzed above in section III.A., the Court will grant Defendant's motion for summary judgment as to the hostile working environment claims on the basis that Chambers has not presented any evidence to suggest that the alleged misconduct constituted severe or pervasive harassment sufficient to maintain an actionable claim.

16

### B. Retaliatory/Discriminatory Discharge Claims

Chambers alleges that he was unlawfully discharged because of his race and that there is a causal connection between his complaints about Sucha in 2001 and 2002 and his subsequent termination in March 2003. In response, Heidelberg claims that Chambers' discriminatory and retaliatory discharge claims both fail as a matter of law. First, Heidelberg contends that Chambers has not provided any direct or circumstantial evidence to demonstrate that Adamson harbored any racial animus to support his discriminatory discharge claim. Second, Heidelberg argues that Chambers did not engage in any protected activity before his discharge because he never lodged any complaint of race discrimination against Sucha or anyone else prior to filing his charge with the EEOC. Third, Heidelberg claims that there is no evidence of a causal connection between the work-related complaints that Chambers did lodge against Sucha and his later discharge by Adamson.

In cases like these, where the plaintiff does not present direct evidence of discrimination, courts apply the three-step, burden-shifting standard, outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to both discriminatory discharge and retaliatory discharge claims. See Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997). Under this burden shifting framework, a plaintiff must first establish a prima facie case of discrimination. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (citing St. Mary's Center v. Hicks, 509 U.S. 502, 506 (1993)). A rebuttable presumption of unlawful discrimination arises if plaintiff presents this prima facie case. Bergen Commercial Bank v. Sisler, 723 A. 2d 944, 955 (N.J. 1999) (citing Texas Dep't. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). To rebut this presumption, the defendant must then set forth admissible evidence of a legitimate, non-discriminatory reason for the employment decision at issue. Id. If the defendant produces

17

evidence of a legitimate, non-discriminatory reason for the employment decision, the presumption of unlawfulness disappears. Id. (citing Hicks, 509 U.S. at 507-08). At that point, the plaintiff must prove by a preponderance of the evidence that the employer's articulated reason was not the real reason for the employment action, but rather was a mere pretext for discrimination. Id. The plaintiff may prove pretext directly by demonstrating that a different reason more likely motivated the employer, or indirectly by demonstrating that the employer's articulated reason is not credible. Id. In spite of these intermediate burden shifts within the discrimination standard, it is ultimately the plaintiff's burden to persuade the fact finder that the employer engaged in unlawful discrimination. Id.; Reeves, 530 U.S. at 143; Burdine, 450 U.S. at 253.

### 1. Retaliatory Discharge

To establish a prima facie case of retaliatory discharge, Chambers must show that (1) he was engaged in a protected activity; (2) he was discharged subsequent to or contemporaneously with such activity; and (3) there is a causal link between the protected activity and the discharge. Woodson, 109 F.3d at 920 (citing Quiroga v. Hasbro, Inc., 934 F. 2d 497, 501 (3d Cir. 1991); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989)); Reyes v. McDonald Pontiac GMC Truck, Inc., 997 F. Supp. 614, 619 (D.N.J. 1998).

With respect to the first element of a prima facie case of retaliatory discharge, the language of Title VII and the NJLAD explains what constitutes a "protected activity." Specifically, § 704(a) of Title VII forbids an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The

phrase "this subchapter" refers specifically to 42 U.S.C. §§ 2000e through 2000e-17, which contain the provisions regarding an employee's rights when an employer has discriminated against him or her on the basis of race, color, sex, religion, or national origin. See Slagle v. County of Clarion, 435 F. 3d 262, 267 (3d Cir. 2006).  Consequently, a charge "under this subchapter" is a charge that alleges discrimination on the basis of one or more of those prohibited grounds. Id.  Similarly, the NJLAD prohibits employment discrimination and retaliation against an employee for opposing a discriminatory practice which is based upon race, color, sex, religion, national origin, or a number of other listed factors. See N.J. Stat. Ann. § 10:5-12. Therefore, in order to have engaged in a protected activity under Title VII or the NJLAD, Chambers must show that his complaints about Sucha's conduct amounted to allegations of discrimination on the basis of race, color, sex, religion, national origin, or some other statutorily enumerated basis.

Chambers now complains that the Defendant discriminated against him based on his race; however, Chambers never once alleged racial discrimination while he was employed by Heidelberg.  None of Chambers' complaints to human resources regarding Sucha mentions or even insinuates that Chambers was complaining of racial discrimination. (See Def. Exhibits 20-23.)  In fact, Chambers apparently made a point of calling the human resources department to clarify specifically that he was not alleging any form of discrimination in his complaints against Sucha. (See Def. Exhibit 27.)  Moreover, Chambers deposed that he did not at any time mention to the human resources department or Heidelberg's management that he considered the complaints he lodged against Sucha to be based on his race. (Pl. Dep. 185-86, 188.)  Now, Chambers argues that the reason he did not complain of racial discrimination while he was

19

employed by Heidelberg is because he feared retaliation.[6]  However, this fear does not obviate

the requirement for protected activity under Title VII and the NJLAD.  In other words, regardless

of the reason why Chambers did not complain of racial discrimination prior to his discharge,

there can be no claim for retaliatory discharge when Chambers never engaged in a protected

activity.  See Reyes, 997 F. Supp. at 619 ("[P]laintiff is unable to show that she was engaged in a

protected activity, and she can not satisfy the prima facie elements of a retaliatory discharge

claim.").  Chambers cannot claim he was discharged in retaliation for complaining of racial

discrimination when the record shows that Chambers never made any such complaints of racial

discrimination prior to his termination. See Vilchock v. Proctor & Gamble Paper Products Co.,

868 F. Supp. 659, 667 (M.D. Pa. 1993) ("As the Plaintiff admittedly did not file or complain of

any discriminatory practices prior to his discharge, Plaintiff can in no way claim the Defendant

retaliated against him for something he did not do.").  As a result, Chambers cannot demonstrate

that he engaged in a protected activity, which is the first element of a prima facie case of

retaliatory discharge.

Moreover, Chambers has also failed to present any evidence to support the second and

third elements of a retaliatory discharge claim.  That is, Chambers has provided no evidence

indicating a causal link between Adamson's decision to terminate Chambers and Chambers'

complaints against Sucha.  By contrast, Adamson's sworn declaration indicates that (1) he did

not consult Sucha at all regarding his decision to terminate Chambers, and that (2) Chambers'

race played no part whatsoever in Adamson's decision to terminate his employment.  Rather,

---

[6]  Although Chambers now claims that he feared retaliation, he deposed that he never saw
or heard of any Heidelberg employee who was retaliated against and further that he knew of
Heidelberg's no harassment policy. (See Pl. Dep. 71-72, 184-186.)

Adamson terminated Chambers because of a series of complaints regarding Chambers' work performance in March 2003. (Adamson Declaration, ¶¶ 6, 7.)  The mere fact that a discharge occurs subsequent to the lodging of a complaint is ordinarily insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.[7] Christman v. Cigas Machine Shop, Inc., 293 F. Supp. 2d 538, 544 (E.D. Pa. 2003) (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997)).  Therefore, even if Chambers had presented evidence that he engaged in a protected activity, he has still failed to present any evidence to establish a causal connection between any protected activity and the alleged retaliatory termination.

Altogether, Chambers has failed to present sufficient evidence to support any of the elements of a prima facie case of retaliatory discharge.  Therefore, the Court need not examine the next steps under the McDonnell Douglas burden-shifting test.  Rather, the Court will grant the Defendant's motion for summary judgment as to Plaintiff's retaliatory discharge claims under Title VII and the NJLAD.

### 2.  Discriminatory Discharge

To establish a prima facie case of discriminatory discharge under Title VII, Chambers must show (1) that he is a member of a protected class; (2) that he is qualified for the position; (3) that he was fired from that position; and (4) that the circumstances of the case give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class. See Jones v. School Dist. of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999); Waldron v. SL Indus., Inc., 56 F.3d 491, 494 (3d Cir. 1995).  Under the NJLAD, the elements are substantially the same except that the fourth element requires a showing that "the

---

[7]  In this case, over a year had passed from the time Plaintiff lodged complaints about Sucha until his subsequent termination. (See Def. Facts. ¶¶ 6, 22.)

employer sought someone to perform the same work" after Plaintiff was fired. See Zive v. Stanley Roberts, Inc., 867 A.2d 1133, (N.J. 2005). Neither party disputes that Chambers is a member of a protected class, was qualified for his position, and was fired from his position. Therefore, the analysis of Chambers' discriminatory discharge claim will focus on the fourth element of a prima facie case.

Chambers has not established the fourth prong of a prima facie case of discriminatory discharge because he has not shown circumstances that give rise to an inference of unlawful discrimination, nor has he shown that Heidelberg sought to replace him with someone else after his termination. See Jones, 198 F.3d at 411; Waldron, 56 F.5d at 494; Zive, 867 A.2d at 1145 . Here, Chambers alleges that the charges that were made against him regarding his work performance were baseless. (Pl. Opp. at  9.)  Chambers appears to argue that these allegedly baseless charges coupled with his complaints about his former supervisor, Sucha, would lead a reasonable person to infer that he suffered unlawful discrimination when Defendant terminated his employment. (See Pl. Opp. 9-10, 16.)  Notably, Plaintiff has not demonstrated that Heidelberg sought anyone to fill his position, much less a person outside of the protected class, nor has he presented evidence to show that the claims against him were baseless or that his complaints against Sucha had anything to do with his discharge.  Although the Court is doubtful that Plaintiff has demonstrated a prima facie case of discriminatory discharge on these facts, the Court will nevertheless continue with the McDonnell Douglas burden-shifting analysis because the Plaintiff's burden at this stage is not an onerous one. See Marzano v. Computer Science Corp., 91 F.3d 497, 508 (3d Cir. 1996) (noting that "the initial burden is not intended to be onerous").

Likewise, the Defendant bears a relatively light burden of production in rebutting a prima

22

facie case of unlawful discharge. <u>Fuentes v. Perskie</u>, 32 F. 3d 759, 763 (3d Cir. 1994).

Specifically, Defendant must only introduce evidence "which, taken as true, would permit the

conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."

<u>Id</u>. (citing <u>Hicks</u>, 509 U.S. at 509.)  Furthermore, the employer need not prove that the proffered

reason actually motivated its behavior because the plaintiff always retains the ultimate burden of

proving intentional discrimination.  <u>Id</u>. (citing <u>Burdine</u>, 450 U.S. at 253, 254, 256).

In this case, Heidelberg has met its burden of production in rebutting Chambers' claim of

discriminatory discharge by providing evidence that Adamson terminated Chambers because he

received several complaints regarding Chambers' job performance and uncooperative attitude at

customer job sites. (<u>See</u> Adamson Declaration, ¶¶ 6, 7.)  Because poor work performance is a

legitimate, nondiscriminatory reason for terminating Chambers' employment, the burden of

production shifts back to the Plaintiff.

To meet that burden, Chambers must establish by a preponderance of the evidence that

Defendant's articulated reason was a mere pretext for discrimination. <u>Fuentes</u>, 32 F.2d at 763.  In

particular, Chambers must demonstrate "such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions" in Heidelberg's proffered reasons for its termination decision

that "a reasonable fact finder could rationally find them unworthy of credence and hence infer

that the employer did not act for the asserted non-discriminatory reasons." <u>Id</u>. at 766 (citations

omitted).  However, it is insufficient for Chambers to show merely that the employer's decision

was wrong or mistaken because the relevant issue is "whether discriminatory animus motivated

the defendant, not whether the defendant is wise, shrewd, prudent, or competent."  <u>Id</u>. (citing

<u>Ezold v. Wolf, Block, Schorr & Solis-Cohen</u>, 983 F.2d 509, 531, 533 (3d Cir. 1992); <u>Villanueva</u>

<u>v. Wellesley College</u>, 930 F.2d 124, 131 (1st Cir. 1991)).

23

Chambers appears to make two arguments to show pretext; however, he has provided virtually no evidence to support his contention that Heidelberg's termination decision was motivated by discriminatory animus.  First, Chambers alleges that his work performance was satisfactory and that the charges made against him were baseless. (See Pl. Opp. at 9, 16.) Although he presents minimal evidence to support that assertion, the inquiry itself is irrelevant to the Court's analysis.  Whether Heidelberg's decision to terminate Chambers was correct, wise, or prudent is beyond the scope of the Court's inquiry because the relevant question is whether the termination decision was motivated by racial animus. See Fuentes, 32 F.2d at 766.  Second, Chambers argues that an email from a customer to Adamson and Sucha, which expresses dissatisfaction with Heidelberg's service on a software upgrade and requests that Chambers return to the customer job site to set up a motor, somehow demonstrates that Adamson's reason for terminating Chambers was a pretext for racial discrimination.[8] (See Pl. Opp. at 15-16.) Again, even if Adamson had been incorrect in assessing Chambers' job performance, that error alone would not mean that Chambers should prevail on a discriminatory discharge claim. Without any specific evidence tending to show that race played any part in Adamson's decision to terminate Chambers, the Plaintiff cannot demonstrate that the proffered reason for his termination was a pretense for unlawful discrimination.  Accordingly, the Court will grant the Defendant's motion for summary judgment as to Chambers' discriminatory discharge claims under Title VII and the NJLAD.

---

[8]The Court notes that the copy of this email attached to Plaintiff's Opposition is not authenticated in any way.

**IV. CONCLUSION**

For the foregoing reasons, the Court will grant Defendant's motion for summary

judgment as to all claims in Plaintiff's Complaint.  The accompanying Order shall issue today.


Dated: ___5-05-06_____                    _s/Robert B. Kugler_____
                                                                          ROBERT B. KUGLER
                                                                          United States District Judge